**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FIRST UNION RAIL CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  03-C-7063** |
| **v.** | ) | |
| | ) | |
| **HELLER PERFORMANCE POLYMERS,** | ) | **HONORABLE DAVID H. COAR** |
| **INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff First Union Corporation ("First Union" or "Plaintiff") brought this action against

Defendant Heller Performance Polymers, Inc. ("Heller" or "Defendant"), according to theories

of breach of contract or, in the alternative, unjust enrichment.  The instant matter proceeded to

bench trial on October 30, 2006.  At the close of trial, both parties submitted post-trial

memoranda on the subject of liability.  Based on the trial, and parties' pre-trial and post-trial

submissions, the Court makes the following findings of fact and conclusions of law.  To the

extent that any findings may be deemed conclusions of law, they shall also be considered

conclusions. To the extent that any conclusions may be deemed findings of fact, they shall also

be considered findings.  *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

1.      **FINDINGS OF FACT**

   a.      **Parties**

        i.      Plaintiff First Union is a North Carolina corporation with its principal
                place of business in Rosemont, Illinois.  First Union is in the business of
                leasing railcars for commercial use.

ii.     Defendant HPPI is a Delaware corporation with its principal place of business in Visalia, California.  HPPI is in the business of manufacturing plastic pellets for use in industrial grade products.

**b.    The Master Lease Agreement**

i.      The parties signed a master lease agreement ("Agreement") in June of 1998.  The Agreement was intended to dictate the general terms according to which First Union would lease to HPPI hopper cars intended for plastic pellets ("cars").

ii.     Under the Agreement, specific terms related to the costs, lease terms, and number of cars to be leased would be set out in additional Riders: "Lessor agrees to lease to Lessee, and Lessee agrees to accept and lease upon the terms and conditions of this Agreement, the railroad cars ("Cars") covered by the riders attached or added to this Agreement from time to time by agreement of the parties (each such rider, a "Rider").  All Cars leased pursuant to such Riders are subject to the terms of this Agreement, and in the event of any conflict between this Agreement and any Rider, the Rider shall control as to the Cars subject to such Rider."  (Agreement ¶ 1.)

iii.    Under the Agreement, Defendant was also to be responsible for additional interest on any rental amounts not paid within ten days of the date due.  (*Id.* ¶ 5(c).)

iv.     The Agreement made lessor First Union responsible for the "performance of all maintenance, repairs, and associated costs made necessary by ordinary wear and tear."  (*Id.* ¶ 5(c).)

v.      Upon termination of a lease term, HPPI was to return each car "at the location indicated in such rider, suitable for interchange service, empty and free from residue, clean and in the same good condition as when each Car was delivered to Lessee by Lessor, ordinary wear and tear excepted and in the condition required by the terms hereof."  (*Id.* ¶ 13.)  Any late return of the cars, as provided by the terms of the Agreement and Riders, would result in a 30-day continuation of the lease at the normal rate.  Upon expiration of this 30-day period, the monthly rental for each overdue car would be set at one and one-half times the original monthly rate.  (*Id.*)

vi.     "With regard to any car or any matter arising under this agreement, any notice, demand, or request required or permitted to be made, given, or served by either party to or upon the other shall be in writing."

The master lease did not contain an expiration date or any other language to suggest that it would lapse or otherwise require renewal.

**c.    Use of Riders**

i.      The first rider was dated June 11, 1998 – concurrent with the Agreement itself – and initiated a 2 year lease for 5 cars (RUSX9021, RUSX9049, RUSX9080, RUSX9132, and RUSX9174).  (Pl.'s Ex. 46.)

ii.     The second rider was signed in March of 1999.  This Rider No. 2 initiated a 6 month lease for 1 car (TQEX 58171).  (Pl.'s Ex. 47.)

iii.    The third rider was signed on August 4, 1999.  This Rider No. 3 renewed 1 car (TQEX 58171) for a 1 year lease.  (Pl.'s Ex. 48.)

iv.     The fourth rider was signed on February 29, 2000.  This Rider No. 4 initiated a 2 year lease for 10 cars (FURX 870049, FURX 870066, FURX 870081, TQEX 58021, TQEX 58056, TQEX 58094, TQEX 58140, TQEX 58209, TQEX 58264, TQEX 58313).  (Pl.'s Ex. 49.)

v.      The fifth rider was signed on March 30, 2000.  This Rider No. 5 initiated a 2 year lease for 5 cars (RUSX 9021, RUSX 9049, RUSX 9080, RUSX 9132, RUSX 9174).  (Pl.'s Ex. 50.)

vi.     The sixth rider was signed on July 7, 2000.  This Rider No. 6 renewed 1 car (TQEX 58171) for a two year lease.  (Pl.'s Ex. 51.)

vii.    The essential terms of each rider would typically be set out in proposal letters sent prior to the rider's signing.  Several of the riders contained references to some form of "appropriate lease documentation" that would be prepared in conjunction with the rider itself.

viii.   The leases listed above were set to expire on or around March 31, 2002 for all 16 hopper cars leased by HPPI.

**d.    Lease Proposal Letter**

i.      On February 13, 2002, Maureen Horrigan ("Horrigan"), on behalf of First Union, sent Lloyd Heller ("Heller") on behalf of HPPI, an email attaching a "proposal letter for the renewal of the plastic pellet cars currently in your service."  (Pl.'s Ex. 3.)  The proposal letter was similar in form to those that had been sent between the parties before, and offered three different options of term and price according to which HPPI could renew the leases on all sixteen cars in its possession.

ii.     A second proposal letter was sent via email on February 19, 2002.  (Pl.'s Ex. 4.)  This proposal offered higher monthly rates but would have shifted responsibility for "gates and hatches" to the lessor.

iii.    On February 25, 2002, apparently in reference to prior phone conversations, Horrigan sent Heller an email directing him to sign the proposal letter dated February 13, 2002 "in order to process your renewal" and memorialize his interest in "the renewal of the equipment for one year at $325.00 per car per month with H. Heller responsible for the gates and hatches."  (Pl.'s Ex. 5.)

iv.     HPPI executed the rate proposal letter on February 28, 2002.  (Pl.'s Ex. 6.)

v.      The proposal letter purported to renew leases on the sixteen cars then in HPPI's service.  The type of lease was to be full service "with Lessee responsible for gates and hatches."  It also stated that upon termination the cars were to be returned "to a point designated by Lessor on the lines of the Burlington Northern Santa Fe (BNSF) or the Union Pacific Railroad (UPRR).  Or a mutually agreed upon location at Lessor's discretion."  They were to be returned "free of all residue."  Upon termination, the leases were to move into month-to-month lease status, with a 30-day written cancellation notice by either party.  (*Id*.)

vi.     The lease rate proposal letter was subject to four terms and conditions: availability and prior commitment of the equipment by First Union Rail; execution of mutually agreeable lease documentation; investment and Credit Committee approval by First Union; and a 30 day limit on the validity of the proposal.  (*Id*.)

e.   **Communication following Lease Renewal**

i.      On March 13, 2002, First Union sent HPPI several riders related to lease renewal (Nos. 7, 8, and 9), along with a Memorandum of Lease, (Pl.'s Ex. 10).  None of these documents – or any additional documentation regarding the February 13, 2002 proposal letter – was ever signed.

ii.     First Union sent invoices for its continued use of the sixteen rail cars.  However, in a fax dated May 9, 2002, denied that a renewal had been signed, expressed an interest in releasing the cars to First Union, and purported to confirm their "previous conversation" on these issues.  (Pl.'s Ex. 11.)  At other points in May of 2002, and later in March of 2004, HPPI demanded that First Union provide disposition instructions for the return of the rail cars.  (Pl.'s Exs. 23, 25, 44.)  However, First Union chose not to provide those instructions until April of 2004.

**f.    Return of the Cars**

   i.    In 2002, HPPI returned one car in each of the months of May, June, and July without receiving any disposition instructions. Nine additional cars were returned over the course of 2003, and the remaining four cars were returned in June and August of 2004.

**g.    Heller's Credibility**

   i.    The testimony of Lloyd Heller, President and General Counsel of HPPI ("Heller"), played a significant role at trial. However, after observing his demeanor and responses at trial, this Court finds that Heller's testimony is not generally credible. At several points, he either obfuscated or directly contradicted himself: though his letter dated May 9, 2002 refers to prior communications and attempts to return the cars, he was unable to provide any details regarding these claims and was directly contradicted by Horrigan on this point; he claimed that HPPI was inconvenienced by the presence of First Union's cars, as the structure of its tracks meant it would have to constantly rearrange them, but the structure of HPPI's spur track was less congested than he claimed (*see* Tr. at 87-88); and, as discussed in more detail below, Plaintiff's portrayal of the negotiations in the spring of 2002 finds no support in the record.

**2.    CONCLUSIONS OF LAW**

**a.    Jurisdiction and Venue are both Appropriate**

   i.    Jurisdiction over this action is appropriate under this Court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

**b.    The February letter represents a binding contract**

   i.    The question on this point is whether the proposal letter, as opposed to the rider, constitutes the contract between the parties. In other words, it is for this Court to determine at what point in the process of renewing their leases the parties entered into a binding agreement. Under Illinois law, a valid and enforceable contract is found where there exists (1) an offer and acceptance; (2) consideration, and (3) definite and certain terms.

   ii.    The February 13, 2002 letter evidences offer and acceptance of renewal.

       (1)    The proposal letter represents an offer by First Union to extend HPPI's lease.

(2)     With respect to Heller's response, this Court will first look to the express terms of the contract. "Traditional contract interpretation principles in Illinois require that an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 706 N.E.2d 882 (Ill. 1999) (citations omitted). This is typically known as the "four corners rule," according to which a court initially considers the language of the contract standing alone. *See id.*

(3)     Here, HPPI's intent to accept the renewal offered in the language of the proposal letter is clear. It instructed Heller to sign and fax the letter "[i]f the terms outlined in this proposal are acceptable." (Pl.'s Ex. 6 at 3.) In addition, Heller signed his name at the end of the document, below the fully capitalized and underlined language "AGREED TO AND ACCEPTED." Therefore, by faxing the reply, according to the terms of the letter, Heller found the offer acceptable.

(4)     It is sometimes proper for a court to look to objective extrinsic evidence in order to clarify ambiguities. *See generally PMC v. Sherwin-Williams Co.*, 151 F.3d 610, 614-15 (7th Cir. 1998). However, under that approach Defendant fares no better: the parties had gone back and forth attempting to negotiate a renewal; several days before Heller faxed the signed form he had been instructed to do so in order to effectuate the renewal; and Heller made no effort to clarify or otherwise second-guess his acceptance until several months had passed. [1]

(5)     Defendant also argues that, according to the parties' prior course of dealing, a rider was always required to effectuate an agreement, and that the proposal letter in this instance therefore cannot be considered to be a binding agreement. But as Defendant itself

---

[1] The legitimacy of the delinquent response Heller sent is undermined by the fact that his claim of prior communications – in which he allegedly rejected the renewal – finds no support in the record. *See* Pl.'s Ex. 11; Tr. at 120-21. Even if such oral communication were supported, it would have little to no effect on the parties' dealings here, where the Agreement under which they operated expressly limited them to written communication. (*See* Agreement ¶ 18.) It is therefore likely that Heller, in refusing the follow-up riders, simply had a change of heart concerning renewal and therefore tried to deny its validity.

points out, "a course of dealing between the parties is admissible to explain, supplement, or add to an agreement, *but not to contradict it*." *See* Def.'s Prop. Conclusions of Law ¶ 57 (emphasis added) (citing *Scott v. Assurance Co. of Am.*, 253 Ill. App. 3d 813, 625 N.E.2d 439, 443 (4th Dist. 1993)). Therefore, where the existence of offer and acceptance is apparent from the face of the writing, as here, recourse to past transactions is not a valid means for contradiction.

(6) Defendant's subjective intent as it approached the proposal letter is not relevant. *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999) ("Whether the parties had a 'meeting of the minds' is determined not by their actual subjective intent, but by what they expressed to each other in their writings. Thus, the parties decide for themselves whether the results of preliminary negotiations bind them, and they do so through their words."). In any event, there is no evidence to support Defendant's contention that his intent in the negotiations in the spring of 2002 was to renegotiate the master lease. Heller claims that the language in the February 2002 letter regarding "agreed lease documentation" was a reference to a new master lease. *See* Tr. at 31. However, all previous proposal letters had used similar language referring only to riders, and there is simply no discussion in any of the correspondence between the parties that would have required or suggested altering the Agreement itself. In addition, there is no reason to believe that the maintenance terms Heller now claims he wanted changed could not have been addressed through changes to the riders, rather than rethinking the Agreement; the parties' proposal letters and riders included such terms, and those subsequent terms would supersede those of the Agreement. (*See* Pl.'s Ex. 1, ¶ 1.)

(7) The fact of the matter is that Defendant did sign the proposal letter, and has never made clear what it intended by signing the proposal letter if not renewal with First Union. Even at trial, Defendant suggested that some terms were still "up in the air," or that what it really wanted was a new Agreement. But it never clarified why, if that was the case, it signed something which by all appearances was a contract completely lacking in any such terms. Defendant's argument that First Union's proposal offer ignored HPPI's interest in changed terms flies in the face of its own choice to sign; had HPPI truly been interested in different terms, it would have pursued further negotiations on this point rather than signing a document ostensibly cementing the parties' obligations. This

Court must look to the intent of the parties first and foremost, and in light of their relationship and significant doubts as to the credibility of Heller's testimony, it is clear that there was a meeting of the minds on an offer to renew the leases and an acceptance of that offer.

iii. The February 13, 2002 letter evidences consideration, in that it obligated HPPI to monthly payments and First Union to allowing the use of its cars.

iv. The February 13, 2002 letter contains definite and certain terms.

(1) The proposal letter is not a completely integrated contract. Several of its terms are vague and/or misplaced, such as the undefined requirement of "appropriate lease documentation," or the seemingly irrelevant checking of credit or shipment of cars where the parties had already been transacting with each other for years. There is therefore some ambiguity with respect to specific terms, for interpretation of which we will look to extrinsic evidence. *See Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993).

(2) Once extrinsic evidence is taken into account, all essential terms can be determined. A mere sequence of correspondence between two parties can amount to a contractual agreement, even if it does not result in a completed document and terms must be cobbled together from different pieces of communication. *See Harris v. Am. Gen. Fin. Corp.*, 54 Ill. App.3d 835, 368 N.E.2d 1099, 11 Ill. Dec. 491 (Ill. App. 3 Dist. 1977). Here, no cobbling of correspondence is necessary; the parties made clear their intent to renew the lease arrangement in the proposal letter itself, and the correspondence surrounding that letter demonstrated their intent to do so according to the first option.

(3) According to the language of the proposal letter, viewed in light of related communication, the 16 cars in HPPI's possession were to be renewed through March 31, 2003, at a rate of $325.00. After termination, the lease would become a month-to-month arrangement with a 30-day written cancellation notice required. The lease type was to be full service, with HPPI responsible for gates and hatches. Cars were to be returned "clean, free of all residue." As in other agreements, the return point was to be designated by First Union, "[o]r a mutually agreed upon location at Lessor's discretion."

v.    Additional arguments against validity of finding a binding agreement are unavailing.

(1)    Defendant raises several arguments against interpreting the proposal letter as a binding agreement.  None of these arguments is compelling.

(2)    HPPI is correct that Heller failed to select the appropriate option on behalf of HPPI.  However, for a variety of reasons this failure does not mean that the contract as written cannot be enforced.  As stated above, if a contract is ambiguous on a disputed issue, "extrinsic evidence can be admitted to discover the parties' genuine intent," so long as there is "either contractual language on which to hang the label of ambiguous or some yawning void that cries out for an implied term." *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods.*, 212 F.3d 373 (7th Cir. 2000).  Here, the failure to indicate in the proposal letter which option was chosen is just such a void.  In light of the surrounding correspondence it is clear that the parties intended to adopt the first option for renewal; Plaintiff contacted Defendant and stated as much just before Defendant sent the confirmatory signature via fax, and rather than objecting, Defendant signed and the document and failed to object for several months afterward.

(3)    Defendant argues that the lack of follow-up documentation, as required in the proposal letter, precludes finding a binding agreement.  For a variety of reasons this lack is not dispositive of any binding effect on the parties.  The mere existence or possibility of additional documentation does not mean that the proposal letter cannot represent a binding agreement; "[t]he fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise." *Dawson v. General Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992).  A contract can be formed before there is an official document memorializing the deal.  *See Chicago Investment Corp. v. Dolins*, 481 N.E.2d 712, 715 (Ill. 1985).  Where the more formal writing – the rejected riders in this case – largely reiterates an earlier agreement, a "clause contemplating execution of formal documents does not reduce the earlier agreement to a mere negotiation." *Harris v. Am. Gen. Fin. Corp.*, 54 Ill. App.3d 835, 839, 368 N.E.2d 1099, 1103, 11 Ill. Dec. 491, 495 (Ill. App. 3 Dist. 1977) (collecting cases).  It is true that in this instance proposal letters were generally accompanied by riders.  *See* Pl's Exs. 46-51.  However, this alone is insufficient for finding that the rider represents the ultimate intent to be bound,

rather than a memorialization of terms. The mere title of a document is not dispositive of its legal impact as a binding document. *See Bonde v. Weber*, 6 Ill.2d 365, 128 N.E.2d 883 (1955). Furthermore, the fact that other transactions were followed by riders amounts to extrinsic evidence that cannot be used to contradict an agreement that is clear on the face of the documents. *Air Safety*, 185 Ill.2d 457.

vi.    The terms of the Agreement apply to the February 22 proposal letter

(1)    HPPI and First Union would typically use a combination of proposal letters and riders to create new leases or lease renewals subject to the terms of the Agreement. In this instance, the proposal letter itself can be seen as a valid and enforceable contract. However, the explicit terms of the parties' contractual dealings do not indicate that the Agreement's terms should apply to the February 22, 2002 contract; the Agreement makes no reference to "proposal letters" as such, and the proposal letter makes no reference to the Agreement.

(2)    A contract is partially integrated where parties "intend the writing to be the final expression of the terms it contains but not a complete expression of all the terms agreed upon-some terms remaining unwritten." *Merk v. Jewel Food Stores Division, et al.*, 945 F.2d 889, 892-93 (7th Cir.1991), cert. denied, 504 U.S. 914, 112 S.Ct 195 (1992). The February 22, 2002 contract is partially integrated, in that its execution required extrinsic evidence regarding leasing details, e.g., return procedures, cleaning requirements, etc. Therefore, "evidence of prior or contemporaneous agreements is admissible to supplement its terms." *Id.* The Riders, the Agreement, and the prior course of dealing show the parties' consistent intent to be bound by the Agreement in their leasing relationship: they repeatedly leased cars according to its terms; so far as the record shows they never transacted without using those terms; and at the time of the February contract the parties had not sought to undermine its use.

(3)    Therefore, the contractual obligations of the two parties from February of 2002 until the end of their commercial relationship are to be found in the February 13, 2002 proposal letter, as supplemented by the terms of the Agreement, insofar as the two do not conflict. Where they do conflict, the terms of the proposal letter will take precedence.

**c.** **HPPI breached its contract by failing to pay rent for the term set out in the February 13, 2002 proposal letter.**

**d.** **First Union did not breach its contractual duties by failing to provide disposition instructions**

    i.    Defendant claims that he was excused from timely return of the cars because Plaintiff failed to satisfy its obligation to provide disposition instructions under the contract.

    ii.    The proposal letter under which the parties should have been operating after February 28, 2002, extended the lease on all 16 cars then in Defendant's possession through March 31, 2003. Therefore, it was not necessary for First Union to provide disposition instructions prior to that date, as HPPI had a minimum lease term of one year.

    iii.    As of the renewed lease's termination on March 31, 2003, the lease became a month-to-month lease arrangement. However, HPPI had already made clear its intention to not be held under the terms of the contract. While this was not sufficient to negate the minimum lease terms under the proposal letter, First Union should have implied from this that HPPI wished to end its contractual obligations as soon as was feasible. Therefore, HPPI effectively provided the "written cancellation notice" required by the February 13 proposal letter, and therefore rather than move into a month-to-month arrangement, all cars should have been returned to First Union by the expiration date of March 31, 2003.

    iv.    First Union did not provide HPPI with disposition instructions until well after the termination of the lease, in April of 2004.

    v.    However, the terms of the proposal letter actually allow greater flexibility for providing disposition instructions than the requirements of the Agreement. It states that the cars are to be returned "to a point designated by the Lessor...[o]r a mutually agreed upon location at Lessor's discretion." (Pl.'s Ex. 6. at 3.) As of March 31, 2003, most of the leased cars had been returned to repair shops doing work with First Union. At no point did First Union reject or otherwise dispute the validity of this method for returning the cars. As of the date at which the cars should have been returned, the parties had implicitly established "a mutually agreed upon location" for the return of the cars. Therefore, First Union did not breach its obligation under the contract.

    vi.    In any event, even if the failure to explicitly provide disposition instructions represented a breach of contract, it was not a material breach

sufficient to warrant non-performance of HPPI's contractual duties. *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714 (7th Cir. 1993) ("It is well established in Illinois that 'only a material breach of a contract provision will justify non-performance by the other party.'") (quoting *Borys v. Rudd*, 152 Ill.Dec. at 628, 566 N.E.2d at 315.).

e.    **HPPI breached its contractual duties by failing to return the Cars to Plaintiff**

i.    Defendant did not return the leased cars in a timely fashion. It's only justification for this breach is that it was prevented from doing so by Plaintiff's alleged breach. However, this Court has already determined that First Union was not in breach, and that even if it was, that breach was immaterial.

ii.    HPPI's letter of May 9, 2002, states a clear plan for the disposition of the cars: "Unless we hear from you within 24 hours we will have no alternative but to release the empties to the local freight agent in your name. We will instruct them to call you for disposition." First Union did not respond within the demanded 24-hour time frame, and did not otherwise prevent HPPI from moving forward with this plan. Therefore, this tacit admission amounts to acceptance of the proposed means sufficient to satisfy the "mutually agreed upon location at Lessor's discretion."

iii.    In a letter written more than one year later, HPPI's plan to return the cars – despite the lack of protest from First Union – was altered by Heller, who stated that First Union had "refused to take back your railcars causing us congestion in our plant and other extra expenses." [CITE] While there was a deliberate effort not to provide disposition instructions, there was nonetheless no such outright refusal; HPPI had already successfully returned cars to First Union by its proposed method and First Union had neither rejected, prevented, nor objected to this process.

iv.    It should furthermore be noted that the clause as it is found in both the Agreement and subsequent documents appears to be intended as a protection for First Union. Therefore, to the extent that First Union chose not to respond or otherwise contradict HPPI's proposed approach to returning the cars, its action can be perceived as the waiver of a right rather than the dereliction of a duty under the contract. It therefore does not justify HPPI's failure to meet its own obligations.

v.    The established method by which HPPI had returned cars to First Union satisfied the need for a "mutually agreed upon location" under the February proposal letter. HPPI therefore was perfectly able to accomplish

its duties under that contract. As of April 1, 2003 – the day after the lease's termination – HPPI had in its possession 5 of the 16 cars it had leased. Its failure to return these cars represents a breach of contract.

**f.      Damages and Fees**

     i.      Rental damages

        (1)      As stated above, the signed proposal letter dated February 13, 2002 represents an enforceable agreement to renew all sixteen cars for a least term ending March 31, 2003. As a result, HPPI is liable for 12 month's lease at a rate of $325.00 per month on each of the 16 cars, amounting to $62,400 in rental damages.

        (2)      Plaintiff also maintains that it is owed an additional month of rental fees at the standard rate once the termination date of each car's lease had passed. This Court agrees. (*See* Agreement ¶ 13.) Therefore, for each of the five cars that were returned after March 31, 2003 (TQEX 58140, 58209, RUSX 9021, RUSX 9049, and RUSX 9080), Plaintiff is liable for a month's rent at the $325.00 rate. This amounts to additional rental damages of $1,625.

        (3)      For each month cars were held beyond April 30, 2003, HPPI is liable to Plaintiff for one-and-one-half times the normal rate of $325, or $487.50. (*See* Agreement ¶ 13.) However, insofar as Plaintiff is owed this – and any other rental amounts not addressed above – Plaintiff's post-trial brief does not make clear how it arrived at its total amount of claimed rental damages. Therefore, additional briefing on this issue is warranted.

        (4)      Plaintiff also claims that it is entitled to an additional month's rental at a rate of $325 "to allow for the cars to be processed and repaired by First Union's contract shops." *See* Pl.'s Prop. Facts at 19. Plaintiff cites to paragraph 13 of the Agreement for this proposition, along with several pages of the transcript. However, Plaintiff has failed to identify documentary support for counsel and witnesses' claims that such a requirement exists, and has not adequately explained why Defendant should be required to pay this amount. Therefore, this claim for rental damages is unsupported and will not be included in Defendant's total liability.

     ii.      Mechanical damages

(1) HPPI failed to return the cars in the "clean, free of all residue" state required under the contract. (*See* Agreement ¶ 13; Pl.'s Ex. 6 at 3.) Plaintiff was able to show that the cars were not cleaned before their return. Defendant's only defense is that it directed its customers to clean them on its behalf. However, there is no evidence that this was ever carried out, or that Defendant took steps to ensure that it was. Therefore, Defendant HPPI is liable for costs related to the cleaning of the cars.

(2) Defendant has failed to rebut Plaintiff's allegation that the cars were returned in a state of disrepair. To the satisfaction of this Court, Plaintiff has shown through the testimony of Mr. Gronstal and Mr. Grossman that it was necessary to repair and/or clean several of the cars after they had been returned by HPPI. (*See* Tr. at 326 *et seq*.) Though Plaintiff was not able to produce witnesses who inspected the cars firsthand upon their return, the process for doing so was a typical business practice that by all indications was satisfactorily carried out in this instance. Defendant contends that it is unclear whether some of these were pre-existing damages from before HPPI's lease. However, under the Agreement Defendant was responsible for inspecting the cars to its satisfaction upon receiving them. (*See* Agreement ¶ 3.) Its failure to do so, and record the observed damage, precludes Defendant from contradicting Plaintiff's claims of damages. Defendant puts forth no objection to the total amount of these claimed damages in its post-trial briefs. Therefore, damages will be granted on all claims of physical damages to the car above and beyond wear and tear or gates and hatches.

(3) In its post-trial briefs, Defendant has not objected to Plaintiff's total claimed mechanical damages of $20,451.07. Therefore, this amount will be included in the total judgment to be entered against Defendant.

iii. Add'l Fees

(1) The Agreement entitles Plaintiff to late charges based upon the prime rate published in the Wall Street Journal. (*See* Agreement ¶ 5(c).) Defendant has not objected to Plaintiff's assertion of the interest rates to be used, therefore this Court accepts them in their entirety for purposes of calculating overdue charges.

(2) The Agreement also entitles Plaintiff, as the prevailing party in this action for default, to reasonable attorney's fees. (Agreement ¶ 12.)

Defendant has not objected, and this Court finds that the awarding of such fees is appropriate.

iv. Where clear from the record, we have stated the amount of damages due. However, with respect to particular matters related to damages – such as the rental owed on overdue cars, interest due, and attorney's fees – more information is required. Therefore, the parties will file an additional brief on the damages calculation, with supporting citations to the record, before final judgment in this matter can be entered.

## 3. CONCLUSION

After carefully reviewing the evidence in this case, this Court concludes that judgment on Count I for breach of contract will be entered in favor of Plaintiff. Count II, pled in the alternative, is moot. Determination of the judgment's total value will be withheld pending additional party submissions pursuant to this opinion and attached minute order.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **November 27, 2007**